## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| **Plaintiff,** | CASE NO. _____ |
| vs. | JUDGE  **2 : 17** cr  **146** |
| DARRELL L. BRYANT,<br>GIFTY KUSI, and<br>JORNEL RIVERA | INDICTMENT  ⌐Judge Marbley<br><br>18 U. S. C. §2<br>18 U. S. C. §1347<br>18 U. S. C. §1349 |
| **Defendants.** | |

**THE GRAND JURY CHARGES:**

At all times relevant to this Indictment:

### INTRODUCTION

1.      The defendants, DARRELL L. BRYANT and GIFTY KUSI, resided in Columbus, Ohio, within the Southern District of Ohio.

2.      Defendant JORNEL RIVERA resided in Dublin, Ohio, within the Southern District of Ohio

3.      Defendants DARRELL L. BRYANT and GIFY KUSI owned and operated Health & Wellness Pharmacy, LLC (H&W), and Health & Wellness Medical Center, LLC (HWMC).

4.      On or about June 1, 2011, H&W became a Domestic Limited Liability Company (LLC) in the State of Ohio.  DARRELL L. BRYANT was listed as the agent and incorporator of the retail pharmacy.

5.     On or about February 24, 2014, HWMC became a Domestic Limited Liability Company (LLC) in the State of Ohio. DARRELL BRYANT was listed as the agent and incorporator of the business.

6.     Defendant DARRELL BRYANT was a Pharmacist (RPh # 03325389) licensed in the State of Ohio. DARRELL BRYANT operated H&W with his wife GIFTY KUSI, who was also a licensed Pharmacist (RPh # 03132085-1).

7.     Defendant JORNEL RIVERA was the medical director at HWMC.

8.     Defendant JORNEL RIVERA obtained his medical license on or about October 13, 1994 and specialized in Addiction Medicine, Internal Medicine and Emergency Medicine.

9.     Defendant JORNEL RIVERA was registered with federal and state authorities to prescribe schedule II-V controlled substances and assigned DEA # BR4287062.

10.     H&W was located at 5050 Blazer Parkway, Suite 202, Dublin, Ohio 43017 within the Southern District of Ohio. H&W was previously located within Sav-a-Lot at: 2200 Mock Road, Columbus, OH, also within the Southern District of Ohio.

11.     HWMC was located at 6810 Perimeter Drive, Suites 100 and 200, Dublin, Ohio 43016, within the Southern District of Ohio.

I.     The Victim Health Insurance Program

12.     The information provided in this section describes the victim, the health insurance program (See "Attachment A" which is incorporated into this Indictment and serves as the Fed.R.Crim.P. 12.4 Disclosure Statement).

II.     Compounding Pharmacy

13.     As a Pharmacy, H&W was required to comply with all rules and regulations of the Ohio State Board of Pharmacy (OSBP). Specifically, pursuant to OSBP rules and regulations,

2

pharmacies were required to maintain records for three years, including the following: records of accountability, purchase records, invoices, dispensing records, wholesale records, waste and destruction records, prescription records, compounding logs and master formula sheets, annual controlled substance audit records and records maintained within the pharmacy's electronic alternate records keeping system.

14. H&W utilized e-prescribing. "E-prescribing" was the computer-based electronic generation, transmission, and filling of a prescription that replaces paper and faxed prescriptions. E-prescribing allowed the providers to electronically transmit a new prescription or renewal authorization to a community or mail-order pharmacy. E-prescribing delivered eligibility, formulary, and medication history data and provides additional clinical decision support.

15. H&W was licensed by OSBP as a non-sterile compounding pharmacy. H&W was required to comply with additional state and federal regulations as a non-sterile compounding pharmacy, pursuant to Ohio Administrative Code §4729-16-03.

16. Compounding was defined as "the preparation, mixing, assembling, packaging, and labeling of one or more drugs in any of the following circumstances: (1) Pursuant to a prescription issued by a licensed health professional authorized to prescribe drugs; (2) Pursuant to the modification of a prescription made in accordance with a consult agreement; (3) As an incident to research, teaching activities, or chemical analysis; (4) In anticipation of orders for drugs pursuant to prescriptions, based on routine, regularly observed dispensing patterns; (5) Pursuant to a request made by a licensed health professional authorized to prescribe drugs for a drug that is to be used by the professional for the purpose of direct administration to patients in the course of the professional's practice...." O.R.C. §4729.01(C).

3

17. A compounding pharmacy was required to comply with additional state and federal regulations pursuant to Ohio Administrative Code §4729-16-03. Specifically, for all non-sterile compounded prescriptions, the pharmacy was required to comply with: the United Sates Pharmacopeia Chapter 795; Section 503A of the Federal Food, Drug, and Cosmetic Act; and the minimum standards for a pharmacy and drug database reporting requirements under Ohio law.

18. A compounding pharmacy must have been licensed to do so; and could only compound if the product is not commercially available.

19. O.A.C. §4729-16-03(J) stated that: "A prescription shall be compounded and dispensed only pursuant to a specific order for an individual patient issued by a prescriber. A limited quantity may be compounded in anticipation of prescription drug orders based on routine, regularly observed prescribing patterns." O.A.C. §4729-16-03(J).

20. Compounding pharmacies were required to maintain the following records: (1) records of all drugs purchased, including names and addresses of wholesalers; (2) all drug orders and records, including logs, relating to the compounding of drugs; (3) records of drugs dispensed or personally furnished; and (4) all other records relating to the compounding of drugs." O.A.C. §4729-16-06.

### III. The Medicaid Program

21. Medicaid, established by Congress in 1965, provided medical insurance coverage for individuals whose incomes were too low to meet the costs of necessary medical services. Approximately 60% of the funding for Ohio's Medicaid program came from the federal government. The Ohio Department of Medicaid (ODM), Columbus, Ohio, managed the Medicaid program, which was managed previously by the Ohio Department of Job and Family

Services (ODJFS). ODM, received, reviewed, and obtained formal authority to make payment of Medicaid claims submitted to it by providers of health care.

22.     In order to be reimbursed by Medicaid for pharmacy or medical services, a provider rendering a service to Medicaid beneficiaries must have entered into a "provider agreement" with ODJFS/ODM in which the provider agreed to comply with all applicable state and federal statutes, regulations and guidelines.

23.     As the owners of H&W, and HWMC, DARRELL BRYANT and GIFTY KUSI entered into a contract with the Ohio Department of Medicaid (ODM) called a Provider Agreement, in which they agreed to abide by all the rules and regulations of the Medicaid program. This agreement allowed defendants DARRELL BRYANT and GIFTY KUSI, to bill for medical services rendered by H&W and HWMC to Medicaid recipients.

24.     ODM contracted with Medicaid Managed Care Organizations (MCOs) through contracts known as Contractor Risk Agreements (CRAs), which conformed to the requirements of 42 U.S.C. §§1395mm and §1396b(m), along with any related federal rules and regulations. MCOs were health insurance companies that provided coordinated health care to Medicaid beneficiaries. The MCOs contracted directly with healthcare providers, including hospitals, doctors, and other health care providers to coordinate care and provide the health care services for Medicaid beneficiaries. Providers who contracted with an MCO, were known as Participating Providers. Pursuant to the CRAs, ODM distributed the combined state and federal Medicaid funding to the MCOs, which then paid Participating Providers for treatment of Medicaid beneficiaries.

25.     Paramount, Buckeye, Caresource, and Molina were Medicaid MCOs that paid claims for home health services submitted by H&W and HWMC.

26.     Medicaid was a health care benefit program, as is defined in 18 U.S.C. §24.

27.     Medicaid paid health care providers, pursuant to written agreements, on the basis of reasonable charges for covered services provided to beneficiaries.

28.     Pursuant to the rules and regulations of the Ohio Medicaid Program, including Medicaid MCOs, Medicaid only paid for services that were actually performed by qualified individuals, were medically necessary, and provided in accordance with Federal and State laws rules and regulations, including anti-kickback laws.

29.     Pursuant to the rules and regulations of the Ohio Medicaid Program, including Medicaid MCOs, Medicaid only reimbursed providers for mental health services if the services were provided by licensed professionals or under the supervision of licensed professionals.

30.     Chemical Dependency Counselor Assistants (CDCAs) were regulated by the Ohio Chemical Dependency Professionals Board (OCDP Board). Pursuant to OCDP Board rules and regulations, CDCAs could perform treatment planning, assessment, crisis intervention, individual and group counseling, case management, and education services as they related to the abuse of or dependency on alcohol and other drugs. However, to do so, CDCAs must have been supervised by a licensed individual, including: independent chemical dependency counselors, clinical supervisor, or counselor III; a medical doctor or doctor of osteopathic medicine; a registered nurse, or certified nurse practitioner (if within the scope of their practice); or a professional clinical counselor, independent social worker, or independent marriage and family therapist. Pursuant to OCDP Board rules and regulations, CDCAs could not have practiced as individual practitioners, or been supervised by pharmacists.

31.     Under the written agreement (also known as a "provider agreement") with Medicaid, providers agreed to bill Medicaid only for services the provider actually rendered,

6

were medically necessary to diagnose and treat illness or injury, and for which the provider maintained adequate supporting documentation. A service or item of equipment was defined as medically necessary when provided "[f]or the treatment of an injury, sickness, or other health condition and was 1) appropriate and consistent with the diagnosis or symptoms, and consistent with accepted medical standards; 2) not chiefly custodial in nature; 3) not investigational, experimental or unproven; 4) not excessive in scope, duration, or intensity to provide safe, adequate, and appropriate treatment."

32.     Providers who provided services to Medicaid beneficiaries used a number assigned to the patient to fill out claim forms. The claim form was submitted by the provider to make claims for payment to Medicaid. ODM, or Medicaid MCOs processed each health insurance claim form and issued payment to the provider for the approved services. Providers submitted claims in paper format, or by electronic means.

33.     ODM and Medicaid MCOs used the written claim forms and or electronic invoices to establish the validity of health care claims entitled to payment. A provider who submitted claims to ODM or Medicaid MCOs certified that the treatment was provided by a qualified individual, actually given to the patient as documented and was medically necessary for the health of the patient.

## IV.     Coding

34.     The American Medical Association assigned and published numeric codes known as the Current Procedural Terminology (CPT) and HCFA Common Procedure Coding System (HCPCS) codes. The codes were a systematic listing, or universal language, used to describe the procedures and services performed by health care providers. The procedures and services represented by the codes were health care benefits, items, and services within the meaning of

7

Title 18, United States Code Section 24(b). They included codes for office visits, diagnostic testing and evaluation, and other services. Drug products were identified and reported to the Federal Drug Administration using a unique three (3) segment number called the National Drug Code (NDC), which was a universal product identifier for human drugs. Health care providers and health care benefit programs use CPT, HCPCS, and NDC codes to describe and evaluate the services and drugs for which they claim have been provided in order to decide whether to issue or deny payment. Each health care benefit program establishes a fee reimbursement for each drug or service described by a CPT, HCPCS, and/or NDC code. The procedures and services represented by CPT codes were health care benefits, items, and services, within the meaning of Title 18, Section 24(b), United States Code.

35.     Health care claim forms, both paper and electronic, contained certain patient information and treatment billing codes including CPT, HCPCS, and NDC codes. Health care programs had established payment schedules based on the codes billed by the provider. By designating a certain code, the provider certified to the health care program that a given treatment was actually rendered in compliance with the code requirements and was medically necessary. These treatment billing codes were well known to the medical community, providers, and health care insurance companies.

36.     Specific CPT codes were assigned for evaluation and management (E/M) services provided to establish patients in a physician's office (some of the E/M services were known as "office visits"). Among these E/M services were office visits billed under CPT codes "99211," "99212," "99213," "99214," and "99215." Insurance companies reimbursed health care providers at increasing rates based upon the level of complexity indicated by the office visit codes. For example, CPT code 99214 was used for office visits for E/M of an established patient

8

which required the physician to perform at least two of the following three components: a detailed history; a detailed examination; and/or a moderately complex medical decision-making. Generally, CPT 99214 was the appropriate code to use when the patient presented problems of moderate to high severity and was with the physician for twenty-five (25) minutes face-to-face.

37.     Specific CPT codes were assigned for psychiatric and psychotherapy services provided to patients. Among these, health care providers utilized CPT Code 90791 for the purposes of identifying psychiatric diagnostic evaluation. By using 90791, providers were indicating they conducted an integrated biopsychosocial assessment, a patient history, psychiatric history, a complete mental status exam, and established of a tentative diagnosis. In addition, CPT 90791 required the provider to make recommendations for a proposed treatment plan. Coverage for this code was limited to physicians, or other qualified health care professionals.

38.     Psychiatric diagnostic evaluations should not have been reported on the same day as a separate E/M code by the same provider. Similarly, psychiatric diagnostic evaluations should not have been reported on the same day as psychotherapy services.

39.     Health care providers utilized CPT code 90837 for the purposes of identifying sixty (60) minutes of individual psychotherapy. Psychotherapy is the treatment of mental illness and behavioral disturbances in which the physician or other qualified health care professional, through definitive therapeutic communication, attempts to alleviate the emotional disturbances, reverse or change maladaptive patterns of behavior, and encourage personality growth and development. For a provider to properly utilize 90837, they must meet face-to-face with the patient, individually, for sixty minutes.

40.     Health care providers utilized CPT code 90838 for the purposes of identifying 60 minutes of individual psychotherapy, with E/M services. For a provider to have properly utilized

90838, providers must have conducted sixty (60) minutes of individual psychotherapy, as indicated above, and additionally conduct an E/M service. The medical assessment requires a physical exam, prescribing of medications, and ordering of laboratory or other diagnostic studies. To have reported both E/M and psychotherapy, using CPT code 90838, the two services must have been significant and separately identifiable. These services were reported by using codes specific for psychotherapy when performed with E/M services as add-on codes to the E/M service. Time associated with the criteria for E/M service was not included in the time used for reporting the psychotherapy service.

41.     Insurance companies reimbursed health care providers at increasing rates based upon whether the provider met individually with the patient or in a group setting. For example, CPT code 90837 which indicated sixty (60) minutes of individual psychotherapy was reimbursed at a higher rate than CPT code 90853, which indicated group psychotherapy.

## COUNT 1
### CONSPIRACY TO COMMIT HEALTH CARE FRAUD
[18 U.S.C. §1349]

42.     Paragraphs 1 through 41 of the Introduction section of the Indictment are realleged and incorporated by reference as though fully set forth herein.

43.     From on or about January 11, 2013 through on or about April 21, 2017, in the Southern District of Ohio, defendants DARRELL BRYANT, GIFTY KUSI, and JORNEL RIVERA, did knowingly and willfully combine, conspire, confederate and agree with others, both known and unknown to the Grand Jury, to violate 18 U.S.C. §1347, that is, to execute a scheme to defraud a health care benefit programs as defined in 18 U.S.C. §24(b), that is the Ohio Medicaid Program, in connection with the delivery or payment for health care benefits, items or services.

### Purpose of the Conspiracy

44.     It was the purpose of the conspiracy that defendants DARRELL BRYANT, GIFTY KUSI, JORNEL RIVERA, and co-conspirators, to unlawfully enrich themselves by: (1) billing, or causing bills to be submitted, for compound creams that were not provided; (2) billing, or causing bills to be submitted, for compound creams that were not medically necessary, because it was not requested to be filled by the patient, and/ or it was not legitimately prescribed by a physician; (3) billing, or causing bills to be submitted, for counseling services that were not provided; (4) billing, or causing bills to be submitted, for individual counseling services that were provided in a group setting; and (5) billing, or causing bills to be submitted, for counseling services by unqualified individuals, when there was no proper supervising physician.

### Manner and Means

45.     It was part of the conspiracy, defendants DARRELL BRYANT, GIFTY KUSI, JORNEL RIVERA, and co-conspirators, billed ODM and Medicaid MCOs for pain, scar and acne compound creams. These compound creams were often billed under NPC codes referencing "Versapro," "Versatile," "Versabasea," "Pracasil," "Tranilast," and "Base, PCCA Spira-Wash."

46.     Between the dates of January 1, 2014 to April 15, 2015, an analysis of billing data revealed, H&W submitted the most claims in Ohio for VersabaseA, with 1,436 claims. The pharmacy with the second highest amount of claims submitted for VersabaseA only submitted 202 claims during the same time period.

47.     Between the dates of January 1, 2014 to April 15, 2015, H&W submitted the most claims for Pracasil TM-Plus, with 1,414 claims. The pharmacy with the second highest amount

of claims submitted for Pracasil TM-Plus only submitted 163 claims during the same time period.

48.     Between the dates of January 1, 2014 to April 15, 2015, H&W was identified as the pharmacy that submitted the most claims for Versatile, with 1,146 claims. The pharmacy with the second highest claims submitted for Versatile only submitted 264 claims during the same time period.

49.     Between the dates of May 7, 2014 and April 13, 2015, H&W was one of the top three pharmacies in the State of Ohio to fill prescriptions for compound creams under the name "Versapro." H&W billed over 600 claims for "Versapro."

50.     It was further party of the conspiracy that H&W billed CareSource, a Medicaid MCO, up to $300 for a monthly supply of the compound pain cream. This was the maximum amount allowable before a pre-authorization was required by CareSource.

51.     It was part of the conspiracy that with the exception of the compound pain creams and Suboxone, H&W had a remarkably low prescription volume.

52.     It was part of the conspiracy that defendants DARRELL BRYANT, GIFTY KUSI, JORNEL RIVERA, and co-conspirators, would submit fraudulent claims to ODM and Medicaid MCOs for these compound creams, and fail to provide the creams to the beneficiaries.

53.     It was part of the conspiracy that more than one hundred and fifty (150) prescriptions were not dispensed according to pharmacy records and Medicaid beneficiaries. However, H&W billed CareSource for prescriptions not dispensed in amounts ranging from $296.73 to $1054.61 each.

54.     In the first quarter of 2015, H&W billed less than ten (10) prescriptions per day on multiple occasions, while on other days H&W billed as many as 477 prescriptions.

55. It was part of the conspiracy that H&W billed ODM and Medicaid MCOs on Saturdays and Sundays when H&W was closed.

56. Specifically, on Saturday, January 17, 2015, H&W billed Medicaid and/or Medicaid MCOs for filling 127 prescriptions; on Saturday, January 31, 2015, H&W billed Medicaid and/or Medicaid MCOs for filling 203 prescriptions; on Sunday, February 8, 2015, H&W billed Medicaid and/or Medicaid MCOs for filling 162 prescriptions; on Sunday, February 22, 2015, H&W billed Medicaid and/or Medicaid MCOs for filling 168 prescriptions; on Saturday, February 28, 2015, H&W billed Medicaid and/or Medicaid MCOs for filling 128 prescriptions; on Sunday, March 1, 2015, H&W billed Medicaid and/or Medicaid MCOs for filling 124 prescriptions; and on Sunday, March 22, 2015, H&W billed Medicaid and/or Medicaid MCOs for filling 186 prescriptions.

57. It was further part of the conspiracy that defendants DARRELL BRYANT, GIFTY KUSI, JORNEL RIVERA, and co-conspirators, would submit fraudulent claims to ODM and Medicaid MCOs for these compound creams, where there was no medical necessity for the cream, because the beneficiaries never requested the cream, never received a prescription, nor ever met with defendant JORNEL RIVERA.

58. It was part of the conspiracy, defendant JORNEL RIVERA, and co-conspirators, would sign off on the prescriptions for the compound creams having never met with the patient, having no doctor/patient relationship, and never determining a true medical necessity for the creams.

59. It was part of the conspiracy that H&W marketed the compound creams at Clinic 5(a Suboxone clinic), Sav-a-Lot, and through a mobile van unit.

60.     Employees notified defendants DARRELL BRYANT and GIFTY KUSI that marketing the creams in this manner was illegal. Defendants DARRELL BRYANT and GIFTY KUSI told the employees not to worry.

61.     It was part of the conspiracy that defendants DARRELL BRYANT and GIFTY KUSI instructed employees to target patients with CareSource insurance.

62.     It was further part of the conspiracy that some customers at Clinic 5 began receiving the compound cream in the mail without ever requesting the cream.

63.     It was further part of the conspiracy that Clinic 5 customers were led to believe they were receiving "free samples" of pain cream after being advised by either Clinic 5 or H&W personnel about the pain cream. However, H&W billed CareSource for these creams. The customers never requested more, yet additional creams arrived automatically in the mail. These were also billed to CareSource.

64.     It was further part of the conspiracy that almost all of the compound cream prescriptions were written and signed by defendant JORNEL RIVERA, who initially worked at Clinic 5. However, the prescriptions were written on H&W prescription pads, not Clinic 5's prescription pads.

65.     It was further part of the conspiracy that defendant DARRELL BRYANT picked up prescriptions in bulk at Clinic 5, and they were not handed to him by the patients.

66.     It was further part of the conspiracy that almost all of the compound cream prescriptions had twelve (12) refills.

67.     It was further part of the conspiracy that H&W operated a pharmacy out of 2200 Mock Road, Columbus, Ohio which was within Sav-a-Lot.

68. It was further part of the conspiracy that customers at Sav-a-Lot were asked by H&W employees which insurance provider they had. If the customer had CareSource, they were asked to fill out a questionnaire. Shoppers were then asked to fill out a form requesting the shopper check boxes for any conditions that they suffered from including, but not limited to: body pain, scars, anti-aging, herpes, constipation, smoking cessation, rashes, and dry skin. After filling out these forms, shoppers received compound creams, monthly, in the mail.

69. It was further part of the conspiracy that many of these customers never met with a doctor, nor did they know defendant JORNEL RIVERA, the prescribing physician.

70. It was part of the conspiracy that defendant GIFTY KUSI instructed employees in the mobile van unit to go to low income neighborhoods with a form (referred to as a "survey") in order to obtain insurance information and ask about the following conditions: scars, pain, dry skin, and anti-aging.

71. It was part of the conspiracy that defendants DARRELL BRYANT and JORNEL RIVERA, and co-conspirators, would, on occasion, also use the mobile van unit for the same purpose.

72. It was further part of the conspiracy that defendant GIFTY KUSI chastised employees after travelling in the mobile van unit if they did not gather enough CareSource customers for the compound cream prescriptions.

73. It was further part of the conspiracy that customers would continue to receive the compound creams after they had directed defendants DARRELL BRYANT and GIFTY KUSI to stop sending them.

74. It was further part of the conspiracy that defendants DARRELL BRYANT and GIFTY KUSI would make medical decisions about which pharmaceuticals customers of H&W

or HWMC should receive. As pharmacists, neither defendants DARRELL BRYANT nor GIFTY KUSI, were permitted to write prescriptions or dictate what should be prescribed to patient. GIFTY KUSI then found doctors to sign off on whatever prescriptions she recommended. Specifically, GIFTY KUSI would discuss the compound creams with patients in the waiting room at HWMC. GIFTY KUSI would send prescriptions to H&W without the patient ever meeting with a doctor.

75.     It was further part of the conspiracy that defendants DARRELL BRYANT, GIFTY KUSI, JORNEL RIVERA, and co-conspirators, submitted claims to ODM and Medicaid MCOs for counseling services at HWMC under CPT codes 90791, 90837, and 90838 utilized for individual psychotherapy services.

76.     It was further part of the conspiracy that defendants DARRELL BRYANT, GIFTY KUSI, JORNEL RIVERA, and co-conspirators, submitted fraudulent claims to ODM and Medicaid MCOs for psychotherapy services at HWMC that were never rendered to patients.

77.     Specifically, patients indicated they would sit in a room with a timer. When the timer went off, they were allowed to leave and receive their Suboxone prescription. No counseling services were provided during this time. Some patients reported coloring in coloring books during the time they were in the room. Notwithstanding counseling services were not provided, HWMC still submitted claims to ODM and Medicaid MCOs, and other insurers for psychotherapy services.

78.     It was further part of the conspiracy that patients at HWMC would receive prescriptions from doctors they never met. Rather, patients would meet with defendant DARRELL BRYANT, who would act as though he was a licensed medical doctor. The patients often referred to him as "Dr. Darrell."

79.    It was further part of the conspiracy, that defendants DARRELL BRYANT, GIFTY KUSI, JORNEL RIVERA, and co-conspirators, would submit fraudulent claims to ODM and Medicaid MCOs for individual psychotherapy services, when the servicers were provided in a group setting.

80.    It was further part of the conspiracy, that defendants DARRELL BRYANT, GIFTY KUSI, JORNEL RIVERA, and co-conspirators, would submit fraudulent claims to ODM and Medicaid MCOs for counseling services by unqualified individuals, such as Chemical Dependency Counselor Assistants (CDCAs), when there was no proper supervising physician.

81.    It was further part of the conspiracy that defendant JORNEL RIVERA was listed as the supervising physician for psychotherapy services allegedly provided at HWMC when defendant JORNEL RIVERA did not supervise the CDCAs.

82.    HWMC billed for lengthy office visits, when the doctors were not in the exam rooms more than five minutes.

83.    It was part of the conspiracy that HWMC treated patients paying with cash differently than those with insurance. The patients paying with cash only had appointments every two (2) weeks or once a month, and paid $300. Insured patients had appointments three (3) times a week. Cash paying patients were only required to attend fifteen (15) minutes of counseling, while insured patients were required to stay for one (1) hour.

84.    It was further part of the conspiracy, that defendant DARRELL BRYANT would abuse his position of trust with some female patients, for his own sexual gratification.

85.    Specifically, on or about June 25, 2016, one HWMC patient went to obtain a Suboxone prescription knowing she had recently used heroin. When the patient was waiting to receive her prescription, defendant DARRELL BRYANT called her to a room in the back of the

17

clinic. When the patient entered, defendant DARRELL BRYANT locked the door behind her. The room did not appear to be an exam room, as it had a couch. Defendant DARRELL BRYANT proceeded to sit on the couch and pointed to the floor in front of him. The patient attempted to explain to defendant DARRELL BRYANT why she used heroin. Defendant DARRELL BRYANT pulled the patient's shirt down, exposed her breasts, and ejaculated on her. When leaving, DARRELL BRYANT specifically mentioned to the patient that she received her Suboxone prescription.

86. It was further part of the conspiracy, for H&W to bill almost three million dollars to ODM and Medicaid MCOs for reimbursement of the compound creams. Of this amount, ODM and Medicaid MCOs paid H&W over two million dollars.

87. It was further part of the conspiracy, defendant JORNEL RIVERA was the ordering provider for more than one million dollars of the compound creams.

88. It was further part of the conspiracy, for HWMC to bill over one million dollars to ODM and Medicaid MCOs for reimbursement for psychotherapy services. Of this amount, ODM and Medicaid MCOs paid HWMC almost eight hundred thousand dollars.

89. It was further part of the conspiracy, defendant JORNEL RIVERA was the supervising physician or rendering provider for more than seven hundred and fifty thousand dollars of the psychotherapy claims.

**All in violation of 18 U.S.C. §1349.**

## COUNT 2
### HEALTH CARE FRAUD SCHEME
[18 U.S.C. §1347 and §2]

90. Paragraphs 1 through 89 of the Indictment are realleged and incorporated by reference as though fully set forth herein.

91.     From on or about January 11, 2013 through on or about April 21, 2017, in the Southern District of Ohio, defendants DARRELL BRYANT, GIFTY KUSI, JORNEL RIVERA, knowingly and willfully executed and attempted to execute a scheme or artifice to defraud a health care benefit program as defined by 18 U.S.C. §24(b), in connection with the delivery of, or payment for, health care benefits, items, or services by submitting fraudulent claims to Medicaid for compound creams never provided to patients.

**All in violation of 18 U.S.C. §1347 and §2.**

## COUNT 3
### HEALTH CARE FRAUD SCHEME
[18 U.S.C. §1347 and §2]

92.     Paragraphs 1 through 89 of the Indictment are realleged and incorporated by reference as though fully set forth herein.

93.     From on or about January 11, 2013 through on or about April 21, 2017, in the Southern District of Ohio, defendants DARRELL BRYANT, GIFTY KUSI, JORNEL RIVERA, knowingly and willfully executed and attempted to execute a scheme or artifice to defraud a health care benefit program as defined by 18 U.S.C. §24(b) in connection with the delivery of, or payment for, health care benefits, items, or services by submitting fraudulent claims to Medicaid for compound creams that were not medically necessary, because it was not requested to be filled by the patient, and/ or it was not legitimately prescribed by a physician.

**All in violation of 18 U.S.C. §1347 and §2.**

## COUNT 4
### HEALTH CARE FRAUD SCHEME
[18 U.S.C. §1347 and §2]

94.     Paragraphs 1 through 89 of the Indictment are realleged and incorporated by reference as though fully set forth herein.

95.     From on or about December 18, 2015 through on or about April 21, 2017, in the Southern District of Ohio, defendants DARRELL BRYANT, GIFTY KUSI, JORNEL RIVERA, knowingly and willfully executed and attempted to execute a scheme or artifice to defraud a health care benefit program as defined by 18 U.S.C. §24(b), in connection with the delivery of, or payment for, health care benefits, items, or services by submitting fraudulent claims to Medicaid for individual counseling services that were not provided, or provided in a group setting.

**All in violation of 18 U.S.C. §1347 and §2.**

## COUNT 5
### HEALTH CARE FRAUD SCHEME
[18 U.S.C. §1347 and §2]

96.　Paragraphs 1 through 89 of the Indictment are realleged and incorporated by reference as though fully set forth herein.

97.　From on or about December 18, 2015 through on or about April 21, 2017, in the Southern District of Ohio, defendants DARRELL BRYANT, GIFTY KUSI, JORNEL RIVERA, knowingly and willfully executed and attempted to execute a scheme or artifice to defraud by submitting fraudulent claims to Medicaid for counseling services by unqualified individuals, when there was no proper supervising physician, in connection with the delivery of, or payment for, health care benefits, items, or services.

**All in violation of 18 U.S.C. §1347 and §2.**

A TRUE BILL.

S| Foreperson
FOREPERSON

BENJAMIN C. GLASSMAN
UNITED STATES ATTORNEY

KENNETH F. AFFELDT (0052128)
Assistant United States Attorney

MARISSA A. FLAHERTY (0080903)
Special Assistant United States Attorney

21

Attachment A

## VICTIM HEALTH CARE PROGRAMS

### Fed.R.Crim.P. 12.4 Disclosure Statement

The following is the victim health care program:

A. The Medicaid program

The Ohio Department of Medicaid
50 West Town Street, Suite 400
Columbus, Ohio 43215

Medicaid, established by Congress in 1965, provides medical insurance coverage for individuals whose incomes are too low to meet the costs of necessary medical services. Approximately 60% of the funding for Ohio's Medicaid program comes from the federal government. The Ohio Department of Medicaid (ODM), Columbus, Ohio, manages the Medicaid program, which was managed previously by the Ohio Department of Job and Family Services (ODJFS). ODM, formerly ODJFS, receives, reviews, and obtains formal authority to make payment of Medicaid claims submitted to it by providers of health care benefits, items or services.