**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **DARRELL L. BRYANT,** | : | |
| | : | |
| **Petitioner,** | : | **Case No. 2:17-cr-00146(1)** |
| | : | |
| **v.** | : | **Chief Judge Algenon L. Marbley** |
| | : | |
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **Respondent.** | : | |

_____

| | | |
|---|---|---|
| **GIFTY KUSI,** | : | |
| | : | |
| **Petitioner,** | : | **Case No. 2:17-cr-00146(2)** |
| | : | |
| **v.** | : | |
| | : | |
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **Respondent.** | : | |

**OPINION & ORDER**

## I.     INTRODUCTION

On December 19, 2018, a jury convicted Darrell E. Bryant and Gifty Kusi of three counts of healthcare fraud and one count of conspiracy to commit healthcare fraud. Bryant was sentenced to 84 months confinement followed by 3 years of supervised release, and Kusi to 24 months confinement followed by 3 years of supervised release. Pursuant to 28 U.S.C. § 2255, both now ask this Court to vacate and set aside their respective judgments of conviction and sentence. Because trial counsel failed to raise several important issues with the Government's loss amount calculation at sentencing, this Court finds that they provided ineffective assistance of counsel in violation of the Sixth Amendment. Accordingly, the § 2255 petitions are

1

**GRANTED IN PART and DENIED IN PART**.  This Court vacates Petitioners' sentences for resentencing.

## II.    BACKGROUND

Bryant and Kusi, a married couple, operated two healthcare facilities with Medicaid contracts in the greater Columbus area: Health & Wellness Pharmacy, LLP ("HWP"), and Health and Wellness Medical Center ("HWMC").  (*See* Stipulation ¶¶ 1–3, ECF No. 79).  Ostensibly, HWMC was an opioid addiction treatment center; HWP marketed and filled prescriptions for patients at Clinic-5, an opioid treatment center.  But in reality, the facilities were used by Petitioners as vehicles for facilitating healthcare fraud.

On July 6, 2017, a federal grand jury indicted Petitioners on one count of conspiracy to commit healthcare fraud (Count 1), in violation of 18 U.S.C. § 1349, and four counts of healthcare fraud, in violation of 18 U.S.C. § 1347.  Specifically, they were charged with allegations of healthcare fraud regarding Medicaid claims for compound creams never provided (Count 2); for compound creams that were not medically necessary or requested by the patient (Count 3); for individual counseling services that were not provided, or provided in a group setting (Count 4); and for counseling by unqualified individuals, when there was no proper supervising physician (Count 5).  (Indictment ¶¶ 42–97, ECF No. 4).  At trial, which began on December 3, 2018, the Government presented evidence that Bryant and Kusi had engaged in various forms of fraudulent behavior through HWP and HWMC.

Starting in 2013, HWP billed the Ohio Department of Medicaid ("Medicaid") and Medicaid Managed Care Organizations ("MCOs") for large quantities of compound creams; HWP claimed that the prescriptions and Medicaid billing was authorized by Dr. Michael Kirwin, a Clinic-5 physician, when, in fact, Dr. Kirwin had not issued or authorized the prescriptions.

2

(*See* Trial Tr. 420:2–18, ECF No. 105; Trial Tr. 1126:19–24, 1129:17–25, ECF No. 108). Later, Bryant and Kusi switched to asking Dr. Jornel Rivera, another physician at Clinic-5, to sign stacks of compound cream prescriptions that Bryant and Kusi had prepared but did not correspond to patients with whom Dr. Rivera had a legitimate physician-patient relationship. (*See* Trial Tr. 67:16–68:6, 87:6–16, ECF No. 102).

HWMC also fraudulently billed Medicaid and MCOs for over $1 million (and received approximately $800,000 in reimbursements) in counseling services under the Current Procedural Terminology ("CPT") code 90838,[1] which corresponds to individual counseling provided in conjunction with a visit for complex evaluation and management ("E/M") on the same day. (*See* Trial Tr. 321:8–20, ECF No. 104; Trial Tr. 1392:19–25, ECF No. 109). Testimony at trial established that much of what had been billed as counseling services at HWMC did not entail counseling at all. (*See* Trial Tr. 490:10–494:4, ECF No. 105; Trial Tr. 1310:11–17, ECF No. 109). Large numbers of patients were left in rooms with a counselor, provided with little to no guidance, not required to engage in counseling, and were free to come and go. And, to the extent that counseling services were sporadically provided, the sessions were conducted primarily in group settings and not by physicians. (*See, e.g.*, Trial Tr. 487:15–490:2, ECF No. 105). Many of the patients received a similarly-lacking amount of attention during their physician visits at HWMC, often spending less than ten minutes (and not always with a physician) before receiving a prescription.

Ultimately, Bryant and Kusi were convicted by the jury of conspiracy to commit healthcare fraud (Count 1) and three counts of healthcare fraud (Counts 3, 4, and 5). (*See* Jury Verdict, ECF No. 89). In the Presentence Investigation Reports ("PSR"), the U.S. Probation

---

[1] CPT codes are numerical codes used to identify medical services and procedures.

3

Department recommended an 18-level enhancement to Petitioners' Total Offense Levels ("TOLs") based on an intended loss calculation of $3.7 million. This figure, which this Court adopted over objections, represented the amount that Bryant and Kusi had billed to Medicaid for compound creams that were not "prescribed by a treating physician, were not medically necessary, and/or not provided to the patients"; for counseling services fraudulently billed under CPT code 90838; and for E/M visits fraudulently billed under CPT code 99214. (Sentencing Hr'g Tr. 96:17–22, 97:16–19, ECF No. 154). At sentencing, defense counsel proffered a statistician, Frank Cohen, who opined that the Government's loss amount calculation relied on unscientific extrapolations that ignored the possibility that some reimbursement claims may have been legitimate. (*See generally id.* 53:13–54:13, 55:1–23; 57:2–58:22). The Court, however, found that Cohen's testimony failed to rebut the Government's *prima facie* evidence of the intended loss. (*Id.* 84:10–17, 21–22). The Court also adopted the two-level abuse-of-trust enhancement recommended in the PSRs for both Bryant and Kusi. (*Id.* 102:9–103:4).

Taking into account the enhancements, Bryant had a TOL of 32 and a criminal history category of 1, for a Sentencing Guidelines range of 121–151 months. This Court sentenced Bryant to an imprisonment term of 84 months. Kusi had a TOL of 30 and a criminal history category of 1. She was sentenced to 24 months imprisonment. Petitioners' appeals of their convictions were rejected by the Sixth Circuit Court of Appeals in March 2021. *United States v. Bryant*, 849 F. App'x 565 (6th Cir. 2021).

Now before the Court are Petitioners' Motions to Vacate and Set Aside Judgment of Convictions and Sentence (ECF Nos. 186, 188), made pursuant to 28 U.S.C. § 2255.[2] As the

_____

[2] The timeliness of the § 2255 petitions is not in dispute. Petitioners had 150 days following the rejection of their appeal by the Sixth Circuit on March 17, 2021, to file a petition for certiorari with the Supreme Court. The one-year statute of limitation for federal habeas corpus petitions, *see* 28 U.S.C. § 2255(f), began running upon the

motions, exhibits thereto, and the Government's responses in opposition, are virtually identical,[3] the Court addresses the motions together. For the sake of convenience, the Court references the briefing and exhibits filed in relation to Bryant's § 2255 petition when discussing and addressing the arguments made about both petitions.

### III.    STANDARD OF REVIEW

Section 2255, which provides a statutory remedy equivalent in effect to the common law petition for a writ of habeas corpus for persons who are convicted in federal court, "permits courts to vacate sentences which were imposed 'in violation of the Constitution or laws of the United States.'" *United States v. Ferguson*, 918 F.2d 627, 630 (6th Cir. 1990) (quoting 28 U.S.C. § 2255). A prisoner seeking relief pursuant to § 2255 "must allege one of three bases as a threshold standard: (1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid." *Weinberger v. United States*, 268 F.3d 346, 351 (6th Cir. 2001) (citing *United States v. Addonizio*, 442 U.S. 178, 185–86 (1979)). The standard here is high: Section 2255 serves not as a mechanism to challenge a technical violation but rather "a 'fundamental defect which inherently results in a complete miscarriage of justice,' or, an error so egregious that it amounts to a violation of due process." *Ferguson*, 918 F.2d at 630 (quoting *Hill v. United States*, 368 U.S. 424, 428 (1968)); *see also United States v. Frady*, 456 U.S. 152, 166 (1982) (noting that a Section 2255 petitioner faces a "significantly higher hurdle" than on direct appeal).

The constitutional right to effective assistance of counsel is well-established. *See generally Strickland v. Washington*, 466 U.S. 668 (1984). Accordingly, claims of ineffective

expiry of that 150-day period on August 14, 2021. *See Clay v. United States*, 537 U.S. 522, 532 (2003). The petitions were filed within one year of that date, on August 12, 2021.

[3] The only differences between the two, as far as this Court can discern, are the defendant referenced, the corresponding pronouns, and several footnotes included in Kusi's memorandum in support but not in Bryant's.

assistance are appropriately raised on collateral review under Section 2255.  *See United States v. Caver*, 470 F.3d 220, 250 (6th Cir. 2006).  Courts have traditionally applied the two-prong *Strickland* test to evaluate claims of ineffective assistance.  According to this framework, the petitioner must first "show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Strickland*, 466 U.S. at 687.  Next, Petitioner must "show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  *Id.*  Put differently, to show prejudice, a petitioner must demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694; *see also Rayborn v. United States*, 489 F. App'x 871, 878 (6th Cir. 2012) (defining "reasonable probability" as "a probability sufficient to undermine confidence in the outcome—certainty of a different outcome is not required" (internal quotation marks and citation omitted)).  Both prongs of this test must be met.

Ultimately, a claim of ineffective assistance must establish not simply that counsel was inadequate but rather that she "was so *manifestly* ineffective that defeat was snatched from the hands of probable victory."  *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992) (en banc) (emphasis in original).

## IV.    LAW & ANALYSIS

Petitioners present three instances of alleged ineffective assistance by their trial counsel:[4] *first*, when trial counsel failed to request a mistrial after the Government allegedly commented

---

[4] Petitioners were represented by separate counsel at trial; they now allege that both counsel made the same series of deficient and prejudicial missteps.

on Bryant's silence at trial in violation of the Fifth Amendment; *second*, when trial counsel failed to introduce evidence purportedly showing that Bryant and Kusi did not act with fraudulent intent when billing for counseling services under CPT code 90838; and *third*, when trial counsel failed to provide evidence and argument that the Government's calculated loss amount, which dictated Petitioners' offense levels and thus the Sentencing Guidelines ranges, was excessive. The Court addresses each ground for relief in turn.

### A.       Failure to Request Mistrial for Alleged Fifth Amendment Violation

It is well-established that "the Fifth Amendment . . . forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Griffin v. California*, 380 U.S. 609, 615 (1965). Allowing comments to that effect would undermine the privilege against self-incrimination embodied in the Fifth Amendment. *Id.* at 614. A comment on the accused's silence can be direct or indirect. *See Raper v. Mintzes*, 706 F.2d 161, 164 (6th Cir. 1983). When a direct comment has been made, the trial court "must reverse unless the prosecution can demonstrate that the error was harmless beyond a reasonable doubt." *Id.* (citing *Chapman v. California*, 386 U.S. 18 (1967); *Eberhardt v. Bordenkircher*, 605 F.2d 275 (6th Cir. 1979)). More common are indirect comments, which are "more troublesome" for courts to evaluate, *id.*, and therefore require a four-factor analysis of their context. *See United States v. Morris*, 533 F. App'x 538, 542 (6th Cir. 2013).

Petitioners argue that this case is an easy one—*i.e.*, that the Government directly and clearly violated the Fifth Amendment. During the closing arguments at trial, the Government told the jury in rebuttal:

> Now, if you listen to Defendant Bryant in his recording, he says the way it worked was when they were trying to explain why all these scripts on Health & Wellness Pharmacy script pads, why aren't they on Clinic 5, he says, well,

because these pain creams, it's kind of a unique blend so we just wanted to fill it out, which is okay. That is okay if you want to fill it out.

Now, it's two ingredients. Why they couldn't put the same two ingredients on Clinic 5 prescription pads is unclear. What Bryant says is they take the stack over to him and the only thing filled out are the ingredients. Dr. Rivera and the Clinic 5 people complete everything else. That's what he's saying. Then he goes and picks up the stack. Darrell Bryant and Gifty Kusi go and pick up the stacks and bring it back.

It's one of two ways. It either happened the way Rivera said it, or it happened the way the defendants say. If it happened the way the defendants say, there's two things. One is they couldn't put it on Clinic 5 pads, but, if that was the case, why aren't these prescriptions — if Dr. Rivera is seeing the patient and they believe they're seeing the patients, why wouldn't Dr. Rivera just fill out the script and hand it to the patient? I mean, the patients are taking the Suboxone scripts over there. They could just as easily take over the compound cream script. Why wasn't that done? What's the reason? There is none.

Secondly, if it happened the way defendants said it happened where he was going to pick up the script and it was all blank when he left them there, then the writing on all those scripts with this information should only include Dr. Rivera's writing or maybe somebody from Clinic 5, but it certainly should not include the handwriting of the defendant. Right?

The defendant has a unique script. It's kind of a sloppy script, but it's very distinguishable. These are Exhibits 400 and 401 for these compound creams. And you can see this is the handwriting of Darrell Bryant. Next, next, next, next, next, next.

Ladies and gentlemen, these are just a few. And if it's done the way he's doing it, it shouldn't happen that way. And if he's not telling you what happened, why isn't he? Because he knows, he knows what he was doing was wrong and it was illegal.

(Trial Tr. 1561:4–1562:20, ECF No. 110). Defense counsel immediately objected to the last paragraph of the excerpt above, which this Court overruled having misheard the statement. (*See id.* 1562:21–24, 1567:17–1569:2). After the Government concluded its closing arguments, counsel renewed their objections to the statement as a Fifth Amendment violation. (*Id.* 1567:1–19). The Court, upon review of the transcript and having heard the Government's explanation,

*see infra*, sustained the objection, gave the jury a limiting instruction when they returned from their lunch break, and struck the statement from the record. (*See id.* 1580:4–14).

The statement, according to Petitioners, represents an egregious example of a Fifth Amendment violation—so egregious that counsel's failure to object more vehemently and request a mistrial represents a failure of Sixth Amendment proportions. (*See generally* Bryant Petition at 10–12, ECF No. 188-1). The Government disputes this, arguing that the statement did not reference Bryant's silence at trial, but rather referred to the recording mentioned in the first paragraph of the excerpt. (*See generally* Gov. Resp. in Opp'n at 14–15, ECF No. 189). The recording memorialized a voluntary statement made by Bryant to Special Agent Flaharty of the Ohio Board of Pharmacy. The first four paragraphs of the excerpt above are clearly about the explanation that Bryant gave to Agent Flaharty in the recording, about why compound cream scripts were written on script pads from HWP rather than Clinic-5 and why the Government believes the explanation was illogical and unsupported by evidence. The last two paragraphs, according to the Government, simply finished the argument, by emphasizing that the misrepresentations in Bryant's explanation to Agent Flaharty stemmed from Bryant's knowledge that the activities he was attempting to justify were illegal. (*See id.* at 15).

This is the same explanation that the Government provided at trial. (*See, e.g.*, Trial Tr. 1570:14–16, ECF No. 110) (counsel for the Government explaining that he "was referencing to what [Bryant] was telling Agent Flaharty about how he took the scripts over, and that what he was saying wasn't the way it was being done"). But the explanation is undermined by the language the prosecutor for the Government used to start the paragraph at issue. His invocation of "ladies and gentlemen" after a pause indicated a transition, an inflection point that separated his discussion of the interview with Agent Flaharty from the argument that followed. It is only

9

after that inflection point, once he has addressed the jury directly, that he then stated: "if he's not telling you what happened . . . ." (Trial Tr. 1562:16, 18, ECF No. 110). The "you" in that statement could only refer to the "ladies and gentlemen" of the jury, whose attention the prosecutor had requested mere seconds earlier.

The Court therefore concludes that the statement at issue violated *Griffin's* prohibition against commenting on the accused's silence at trial. The prosecutor had signaled a break from his discussion of the interview with Agent Flaharty; he then referenced what Bryant had not told the jury, thereby invoking Bryant's silence at trial. Even assuming *arguendo* that the statement could be understood differently—*i.e.*, that the statement was ambiguous—that would not be enough to rescue the Government's position. When confronted with an indirect statement about an accused's silence, courts in the Sixth Circuit "will not find manifest intent if some other explanation for the prosecutor's remarks is equally plausible," *Lent v. Wells*, 861 F.2d 972, 975 (6th Cir. 1988) (citing *Robinson*, 651 F.2d at 1197), in applying the traditional four-factor analysis of the statement's context. *See Byrd v. Collins*, 209 F.3d 486, 533 (6th Cir. 2000) (noting that the first of these factors is whether a comment "'manifestly intended' to reflect the accused's silence or [was] of such a character that the jury would 'naturally and necessarily' take [it] as such." (quoting *United States v. Moore*, 917 F.2d 215, 225 (6th Cir. 1990))). The statement here, on the other hand, was a direct comment: it directly addressed Bryant's silence at trial. Any ambiguity, to the extent that it exists, as to the meaning of a direct comment on the accused's silence must be resolved in favor of the accused. *Cf. id.* (noting that "a reviewing court must look at all the surrounding circumstances in determining whether or not there has been a constitutional violation" only "[w]hen the alleged infringements consist of [indirect] references" (quoting *Butler v. Rose*, 686 F.2d 1163, 1170 (6th Cir. 1982) (en banc))).

10

Even so, Petitioners fail to show that trial counsel acted in a deficient manner. They argue that, instead of simply objecting at the time the statement was made, later re-raising the objection, and requesting a curative instruction, counsel should have requested a mistrial; and that, when this Court sustained the re-raised objection and agreed to issue a curative instruction, counsel should have objected that the instruction was given too late. (*See* Bryant Petition at 6–7, ECF No. 188-1). Thus, Petitioners' allegation is not that their counsel failed to object to the allegedly prejudicial statement, *see Hodge v. Hurley*, 426 F.3d 368, 377 (6th Cir. 2005) (noting that "a failure to object to prosecutorial misconduct can amount to ineffective assistance of counsel"), but rather that the "failure to request the proper relief"—*i.e.*, a mistrial—represented ineffective assistance. (Bryant Petition at 7, ECF No. 188-1) (quoting *Ramchair v. Conway*, 601 F.3d 66, 71 (2d Cir. 2010)).

This argument assumes not just that there is a "proper" form of relief for a *Griffin* violation, but also that there is only one appropriate form of relief to the exclusion of all other forms. Without both assumptions, Petitioners' argument falls apart: if some other form of relief may be appropriate, then it is difficult to imagine that counsel's decision to pursue such other relief would be an "error[] so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. Unfortunately for Petitioners, their assumptions do not stand up to scrutiny.

Petitioners have failed to demonstrate that a mistrial is the only appropriate remedy for a *Griffin* violation. They cite no caselaw establishing that a "curative instruction could not undo the damage done by the government's unconstitutional commentary." (Bryant Petition at 7, ECF No. 188-1). After all, this is not a case involving "statements [that] were deliberately injected into the proceedings to inflame the jurors' emotions and fears" such that they were "so

11

inflammatory . . . that no charge could have sufficiently cured the prejudice." *United States v. Solivan*, 937 F.2d 1146, 1157 (6th Cir. 1991) (citing *United States v. Lowe*, 534 F.2d 87, 89 (6th Cir. 1976)).  Faith in jurors' ability to digest and follow limiting instructions is a central tenet of the American judicial system.  *Cf. Steele*, 684 F.2d at 1205.  The fact that part of the analysis for whether an indirect comment on the accused's silence warrants reversal looks to "whether appropriate curative instructions were given" indicates that curative instructions to the jury are a common remedy for statements that violate *Griffin*.  *United States v. Gonzalez*, 512 F.3d 285, 293 (6th Cir. 2008) (citations omitted).  Thus, it was reasonable for trial counsel to request a curative instruction in their objection.

Nor have Petitioners established that mistrial is so clearly the only appropriate remedy for the alleged Fifth Amendment violation at issue that counsel's failure to request a mistrial was deficient.  Consider *Ramchair v. Conway*, the sole case that Petitioners cite in support of their position here.[5]  In *Ramchair*, the trial court found that counsel made a multiplicity of "simply incorrect" assumptions, leading to a failure to request relief that "the [] court could not reasonably have denied."  671 F. Supp. 2d 371, 377, 378 (E.D.N.Y. 2009); *see also Ramchair v. Conway*, 671 F. Supp. 2d 365 (E.D.N.Y. 2008), *vacated by*, 335 F. App'x 122 (2d Cir. 2009).  In other words, an assertion that trial counsel was deficient for failing "to request the proper relief," above and beyond the appropriate relief she already did pursue, must clear a high bar—the "proper relief" must be inexorably warranted.

But it is not the case that this Court could not reasonably have denied a motion for mistrial or that the Sixth Circuit could not reasonably have declined to reverse a ruling denying

---

[5] Petitioners cite the Second Circuit's decision on appeal in *Ramchair*, 601 F.3d 66 (2d Cir. 2010).  The portion of the decision that they quote simply recounts the trial court decision earlier in the litigation, *see id.* at 71, the full history of which is too tortured to recount for present purposes.

such a request. (*See also* Bryant Petition at 8, ECF No. 188-1). True, the Sixth Circuit has on occasion reversed convictions involving prejudicial comments to which defense counsel did not object. (*See id.*) (citing *Rachel v. Bordenkircher*, 590 F.2d 200 (6th Cir. 1978); *Raper*, 706 F.2d 161 (6th Cir. 1983)). That is no guarantee, however, that a mistrial would have been the relief granted in this case. This was not a case, for example, where defense counsel failed to object and the jury was not given curative instructions. *See Rachel*, 590 F.2d at 203. Nor is this a case where "the prosecutor made repeated comments" about the failure to testify. *Raper*, 706 F.2d at 167; *see also Rachel*, 590 F.2d at 202 (condemning statements "calculated . . . to create in the jurors' minds an inference of guilt based solely on petitioner's election to remain silent"). In fact, the Government's statement, which consisted of two sentences in the middle of a 20-page rebuttal and was accompanied by no other comments beforehand or afterward about Bryant's silence at trial, was isolated.[6] The Court does not deny that a request for mistrial may have been granted; all this is only to explain that the record does not indicate that mistrial was so clearly the only appropriate remedy that counsel's failure to pursue it at trial was deficient.

As Petitioners have failed to carry their burden of demonstrating that trial counsel's decision to object and seek a curative instruction for the alleged Fifth Amendment violation constituted ineffective assistance, their first ground for relief is **DENIED**.

### B.     Failure to Adduce Purported Evidence Disproving Fraudulent Intent

The second claim of ineffective assistance relates to the charges that Petitioners fraudulently billed Medicaid for addiction-counseling services provided at HWMC under CPT

---

[6] Petitioners argue that the statement was not isolated because it was delivered "at a pivotal moment in the case—just as the prosecutor was concluding the rebuttal portion of his closing argument." (Bryant Reply Br. at 4 n.3, ECF No. 193). Petitioners previously claimed that a gap of five paragraphs is too substantial to link plausibly the Government's discussion of the Bryant recording and the allegedly prejudicial statement. (*See id.* at 2). If that argument is to be credited, then the twelve-paragraph gap between the statement at issue and the actual conclusion of the Government's closing is a chasm. (*See* Trial Tr. 1562:25–1565:25, ECF No. 110).

13

code 90838. These charges formed the basis for Petitioners' convictions on healthcare fraud in Counts 4 and 5 of the indictment (as well as for the conspiracy charge in Count 1). As noted earlier, CPT code 90838 is an "add-on" code that refers to counseling services provided in addition to or in conjunction with an underlying office visit for evaluation and management with a physician on the same day. (Bryant Ex. A, ECF No. 188-2 at 4). The Government alleged— and produced evidence at trial—that Petitioners submitted claims under 90838 for counseling sessions that were not conducted by the same medical provider who conducted the underlying office visit, did not involve any counseling at all, and were done in group sessions instead of as individual sessions.

Petitioners suggest that there were four pieces of evidence that trial counsel failed to present to the jury, each of which would have demonstrated that Petitioners lacked fraudulent intent when billing under CPT code 90838: *first*, the actual text of CPT code 90838 itself, which Petitioners assert would have undermined the Government's claim that 90838 only covers counseling services conducted by the same medical provider that performed the same-day office visit with the patient; *second*, an expert who could testify to the same effect, and also to the legitimacy of Petitioners' billing practices; *third*, Medicaid billing rates showing that HWMC could have been reimbursed at a higher rate if it had billed the counseling services under CPT code 90837 rather than under 90838; and *fourth*, an email from Laura Dean at IMAX Medical Billing, the outside contractor that administered HWMC's medical billing, which Petitioners apparently relied on in formulating their billing practices. (*See generally* Bryant Petition at 10–16, ECF No. 188-1).

<u>Evidence on the Scope of CPT code 90838</u>. The Government asserted at trial that 90838 only applies if the counseling session and the associated E/M office visit were both provided by

14

the same medical provider. (*See, e.g.*, Trial Tr. 1473:11–14, ECF No. 110) (stating in closing that the Government's witnesses, "Special Agent Morse and Steve Smith[,] testified as to their understanding of what that code is and what that code requires, including that it is provided by the same provider who provided the underlying office visit . . . ."). Petitioners claim that the first and second items of evidence listed above would have undermined that assertion—and thus would also have undermined the allegation that Bryant and Kusi intended to commit healthcare fraud by billing counseling services not provided by the same physician as 90838 services. *See United States v. Sosa-Baladron*, 800 F. App'x 313, 318 (6th Cir. 2020) (noting that a conviction for healthcare fraud requires showing that the "defendant had the intent to defraud" (citations omitted)).

The first piece of evidence is the actual text of CPT code 90838, which does not specify a particular provider and refers only to "[p]sychotherapy, 60 minutes with patient when performed with an evaluation and management service." (Bryant Ex. A, ECF No. 188-2 at 4). Along the same lines, Petitioners argue that trial counsel should have retained an expert who could testify at trial about the correct scope of 90838, such as Glenda Hamilton, a Certified Professional Coder whose declaration has been provided with the petitions. (*See* Declaration of Glenda Hamilton ("Hamilton Decl."), ECF No. 188-4. In her declaration, she writes that "code 90838 most certainly does not state that the psychotherapy provided under code 90838 has to be provided by the same provider who conducted the underlying evaluation and management" and that, in fact, Petitioners' practice of billing 90838 for counselling services provided by different individuals from the underlying E/M visit is in line with "governing rules and accepted industry practice." (*Id.* ¶¶ 9, 10).

But even if Petitioners are correct that the Government's witnesses were wrong about the scope of CPT code 90838 and that trial counsel should have called an expert witness on that topic, their argument still fails for lack of prejudice. After all, Petitioners do not dispute that the provision of counseling services is a prerequisite for billing under CPT code 90838. And there was plenty of evidence at trial that much of the "counseling" being provided at HWMC did not actually entail counseling at all, and further that attempts to engage in actual counseling were rebuffed by Bryant. (*See, e.g.*, Trial Tr. 511:5–513:1, 514:18–515:12, ECF No. 105).

It is undisputed that HWMC employed counselors on staff, and that these counselors interacted with patients. It is true, too, that some patients testified to receiving counselling. (*See* Bryant Reply Br. at 14 n.9, ECF No. 193) (collecting examples). But testimony at trial indicated that there was no counseling going on in the bulk of these sessions. (*See also* Trial Tr. 479:7–12, ECF No. 105; Trial Tr. 1310:11–17, ECF No. 109). Petitioners appear to assume that, simply because HWMC employed counselors and because those counselors led sessions, there must have been counseling going on—even if it may have been "haphazard and disorganized." (*See* Bryant Reply Br. at 14, ECF No. 193). But there is a distinction between counseling that is executed negligently or incompetently and an absence of counseling activities altogether. Testimony at trial established that the activities at HWMC fell on the wrong side of that distinction, with both patients and counselors testifying that the sessions at HWMC did not involve counseling at all. (*See, e.g.*, Trial Tr. 414:2–11, ECF No. 105) (describing art therapy sessions that involved nothing more than direction-less coloring).

Because the record supports the conclusion that Petitioners billed Medicaid for counseling services under CPT code 90838 that were not actually provided at HWMC, there is not a "reasonable probability that, but for [the failure to dispute the scope of 90838], the result of

16

the proceeding would have been different." *Strickland*, 466 U.S. at 694. Even if Petitioners had established that CPT code 90838 allows for a different provider to conduct the counselling session, billing Medicaid for counseling services that did not occur would still be healthcare fraud on its own. *See Bryant*, 849 F. App'x at 570 (6th Cir. 2021). Accordingly, Petitioners did not suffer prejudice from counsel's failure to present evidence on the scope of 90838.

 <u>Evidence about CPT code 90837</u>. The other two pieces of evidence that trial counsel failed to adduce at trial are both about CPT code 90837, which is used for "stand-alone" counseling services—*i.e.*, counseling that was done separate from an E/M visit. This stands in contrast with CPT code 90838, which can only be billed as an "add-on" to an E/M visit with a physician on the same day. Petitioners note that trial counsel failed to present evidence that HWMC could have been reimbursed by Medicaid at a higher rate if it had billed the counseling sessions under CPT code 90837 ($81.99 per hour) instead of under CPT code 90838 ($75.29 per hour). (*See* Bryant Petition at 14–15, ECF No. 188-1). Relatedly, trial counsel did not present an email from Laura Dean to Petitioners, in which she listed different CPT codes and the associated billing rates. (*Id.* at 15; *see* Bryant Ex. B, ECF No. 188-2 at 6). The listed codes include both 90837 and 90838; Dean notes in the email that 90837 cannot be billed with an associated physician visit but that 90838 can be.

 To Petitioners, that they could have billed Medicaid for the counseling sessions at a higher rate is evidence that they lacked fraudulent intent in billing the lower rate. But the fact that Petitioners could have engaged in greater fraud by billing non-existent counseling services under 90837 in no ways undermine the conclusion that the 90838 billing was fraudulent. And there is no indication from Dean's factual recitation of the rates and prerequisites of various CPT billing codes in her email that she was giving Petitioners advice or instructions on how to bill or

17

expressing approval of their billing practices; rather, she simply listed objective information. Trial counsel was not deficient for failing to present evidence about CPT code 90837 at trial.

As such, Petitioners' second ground for relief is **DENIED** as well.

### C. Failure to Adduce Evidence of Excessive Intended Loss Calculation

Lastly, Petitioners argue that trial counsel provided ineffective assistance for failing to rebut adequately the Government's loss calculation amount, which was accepted by this Court and dictated Petitioner's offense level at sentencing. This argument includes three components.

*First*, Petitioners suggest that trial counsel should have, but did not, contest the inclusion of Medicaid reimbursements that Petitioners had billed under CPT code 99214 in the total loss amount because the only evidence at trial of 99214 fraud consisted of ambiguous testimony from Dr. Franklin Demint. *Second*, Petitioners argue that trial counsel should have adduced evidence that Petitioners never intended to receive the full amount that they billed for reimbursement. The Sixth Circuit has explained that, in healthcare fraud cases, though "the total amount fraudulently billed . . . is prima facie evidence of the intended loss[,] . . . defendants can rebut the presumption that intended loss is the amount billed with evidence that they never intended to receive that amount." *United States v. Bertram*, 900 F.3d 743, 752 (6th Cir. 2018) (citing U.S.S.G. § 2B1.1 cmt. n. 3(F)(viii)). At sentencing, counsel did not submit evidence rebutting the Government's *prima facie* calculation. *Third*, Petitioners allege that trial counsel should have disputed the loss amount attributed to compound cream prescriptions written by Dr. Rivera, which accounted for $1,312,026.06 of the total $3.7 million loss amount. (*See* Trial Tr. 1382:17–21, ECF No. 109). Dr. Rivera testified at trial that he stopped prescribing compound creams without first establishing a doctor-patient relationship—*i.e.*, stopped writing fraudulent prescriptions—after

October 27, 2014. (*See* Trial Tr. 686:1–687:3, ECF No. 106). But over 60% of the billing for compound cream prescriptions attributed to Dr. Rivera was for scripts written after that date.

As to the assertion that counsel should have contested the inclusion of reimbursements billed under 99214, the record reflects that 99214 fraud was indeed pervasive. It is true that the testimony of Dr. Franklin Demint is not enough to show pervasiveness. He testified at trial that he conducted about three or four 99214 visits a day, out of the approximately 40 patients that he saw each day. (*See* Trial Tr. 770:6–13, ECF No. 106). The Government represents that this testimony indicates that "at least 90% of the 99214 bills associated with Dr. Demint's practice were fraudulent." (Gov. Resp. in Opp'n at 27, ECF No. 189). That interpretation requires a serious leap in logic: after all, there is no indication that Dr. Demint's other patient visits were coded as 99214 visits or fraudulently billed by Petitioners as such.

But other evidence at trial was sufficient to support a finding of pervasive 99214 fraud. The Government presented an exhibit showing that nearly 65% of the office visits conducted at HWMC were billed as 99214 visits; over 73% of office visits with established patients were billed as 99214 visits. (*See* Gov. Trial Ex. 301, ECF No. 173 at 3–4). But whereas 99214 refers to complex E/M patient visit of about 25 minutes, testimony at trial established that Petitioners would often schedule ten patients within a single 15-minute period at HWMC. (Trial Tr. 1233:21–24, ECF No. 108). Patients testified to sitting through brief, cursory visits on each trip to HWMC. (*See, e.g.*, Trial Tr. 890:19–891:14, 892:2–8, ECF No. 107). And, even worse, patients would often be seen by Petitioners themselves, who were not physicians but represented to patients that they were. (*See id.* 892:9–15, 893:8–17, 894:6–15). In short, the fact that a substantial majority of office visits were billed as 99214 and that plenty of testimony at trial showed patients were not receiving care that would qualify as a 99214 visit supported a finding

19

of pervasive 99214 fraud—and accordingly, the inclusion of 99214 billing in the loss amount. Counsel's failure to contest this issue was therefore not deficient.

On the other hand, the Government effectively concedes that trial counsel should have presented evidence that the loss amount was based on the amount Petitioners billed to Medicaid rather than the amount they expected to receive. (*See* Gov. Resp. in Opp'n at 32–33, ECF No. 189) (disputing only whether such an objection would have been prejudicial). The Court therefore concurs with Petitioners that that failure was deficient.

The Court also finds that counsel's failure to dispute the loss amount for compound creams prescribed by Dr. Rivera was deficient. On the witness stand, Dr. Rivera explained that, at Clinic-5, he took over the patients who were previously being prescribed compound creams by Dr. Kirwin. (*See* Trial Tr. 692:23–693:2, ECF No. 106). Three or four months into the transition, in April 2014, he asked for a list of all the patients for whom he had signed prescriptions. (*Id.* 694:8–13). Of those patients, he had actually seen—that is, established a *bona fide* doctor-patient relationship with—"less than five percent of them." (*Id.* 696:5–6). Based on that statement, the Government asserts that "over 95% of the prescriptions provided by Petitioner Bryant and Kusi that Dr. Rivera signed . . . were not legitimate." (Gov. Resp. in Opp'n at 30, ECF No. 189). And because the fraudulent prescribing by Dr. Rivera was so pervasive, there was no need to separate out the fraudulent billing from the legitimate billing. (*See id.* at 28–29) (citing *United States v. Lovett*, 764 F. App'x 450, 460 (6th Cir. 2019)).

But once again the Government makes a mountain out of a molehill, just as it did with Dr. Demint's testimony. It is true that Dr. Rivera said that less than five percent of the prescriptions he had written for patients he had taken over from Dr. Kirwin in early 2014 were legitimate. But the fact that 95% of the compound cream prescriptions he had written as of April

20

2014 were fraudulent does not mandate the conclusion that 95% of *all* compound cream prescriptions he wrote for Petitioners were fraudulent. Dr. Rivera testified that he stopped signing scripts for patients with whom he did not have a legitimate doctor-patient relationship starting on October 27, 2014—after which point, he wrote compound cream prescriptions that accounted for $894,865.35 in Medicaid reimbursements, or about 40% of the total that Petitioners received for compound cream prescriptions. (Trial Tr. 686:22–687:3, ECF No. 106; *see* Bryant Ex. C, ECF No. 188-2 at 12–100).

It may well be the case that compound cream fraud was pervasive. The Government has certainly pinpointed plenty of evidence presented at trial showing that it was. (*See* Gov. Resp. in Opp'n at 29, ECF No. 189) (collecting examples of patients who testified about receiving creams without discussing them with their doctor or without requesting them). It may also be the case that Dr. Rivera engaged in compound cream fraud even after October 27, 2014. But the Government has not identified any evidence refuting his testimony. (*See generally* Gov. Resp. in Opp'n at 28–31, ECF No. 189). While the Sixth Circuit has on occasion "approved of using the total amount billed to Medicaid during a pervasive health care fraud scheme," *Lovett*, 764 F. App'x at 460; *see also United States v. Washington*, 715 F.3d 975 (6th Cir. 2013), it has also noted that "further explanation of the bases for the Government's loss calculation may be necessary" where "evidence is presented to distinguish legitimate claims from fraudulent ones." *Lovett*, 764 F. App'x at 460. Here, Petitioners have shown that their counsel failed to present evidence distinguishing potentially legitimate prescriptions—which account for over 40% of the loss amount attributed to compound creams—from fraudulent prescriptions. And the sheer volume of allegedly legitimate prescriptions written by Dr. Rivera after October 27, if his testimony is credited, would also undermine the Government's reliance on caselaw affirming

21

trial court decisions that adopted the total loss amount where "the entire wellness program was a sham." *Washington*, 715 F.3d at 985.

The meager resistance provided by trial counsel at sentencing cannot be construed as effective assistance.[7] Counsel argued that the loss amount corresponding to compound cream prescriptions was inaccurate because the Government's calculation relied only on a few examples of fraudulent bill, which could not "serve as a valid statistical sample from which to extrapolate 100% loss." (Bryant Sentencing Memo. at 7, ECF No. 134). In other words, the Government had calculated the loss amount by first establishing that some compound cream prescriptions were fraudulently billed, then assuming that all such prescriptions were fraudulently billed based on pervasiveness. Trial counsel for Petitioners disputed the second step; they called an expert, who testified that the Government had not used a "statistically valid random sample" of the compound cream prescriptions to show that fraud was pervasive. (*See* Sentencing Hr'g Tr. 55:5–23, ECF No. 154).

There is a difference, however, between attempting to poke holes in the Government's statistical techniques and providing affirmative evidence that a substantial portion of the calculated loss amount was unproven. The former is easy to reject. It suggests only that the Government's calculation was wrong without providing an alternative: Petitioners' opinion witness did not identify any prescriptions that were wrongly fingered as fraudulent, provide a feasible alternative approach for calculating the loss amount, or even proffer his own estimate or calculation of the loss amount in the case. (*See id.* 52:2–54:2, 56:12–19, 65:14–66:2). This

---

[7] The analysis that follows applies with equal force to the Government's contention that counsel adequately presented the compound cream issue on appeal, since the appeal focused on the same issue argued at sentencing. (*See* Gov. Resp. in Opp'n at 32, ECF No. 189).

failed to satisfy a defendant's burden to "prove the specific value by which the loss amount should be reduced." *United States v. Reid*, 764 F.3d 528, 534 (6th Cir. 2014).

Consider, on the other hand, if trial counsel had explained that testimony at trial indicated that $894,865.35 of the $2.1 million loss amount for compound cream prescriptions was derived from legitimate prescriptions (or, at the very least, that the Government had not presented evidence rebutting testimony that those prescriptions were legitimate). The presentation of such evidence would satisfy the burden to identify with specificity what a reduced loss amount would be. *See id.* It would also have severely undermined the Government's argument that "separating legitimate benefits from the fraudulent ones is not reasonably practicable," since there is a clear dividing line—before and after October 27, 2014—between compound cream prescriptions shown to be fraudulent at trial and those not proven to be fraudulent. (*Id.* 79:4–6). The failure to point out that dividing line, which was readily apparent from trial testimony, was deficient performance. *Cf. Bryant*, 849 F. App'x at 571 (finding that, because defense counsel had failed to "provide the court with any specific amounts to be excluded[,] . . . the [district] court made a 'reasonable estimate' of the amount of loss").

The cumulative effect of these failures was certainly prejudicial to Petitioners. As discussed, after October 27, 2014, Dr. Rivera wrote compound cream prescriptions for which Petitioners received $894,865.35 in reimbursements. Additionally, the Government calculates the difference between the amount billed for fraudulent claims and the amount received for those claims to be $519,636.39. (*See* Gov. Resp. in Opp'n at 32–33, ECF No. 193). The sum of these numbers is substantial: $1,414,501.74.[8]

---

[8] Of course, the Court acknowledges the possibility that, had trial counsel raised the issues identified here, the Government may well have provided rebuttal evidence tending to show that the total loss amount should not be

At sentencing, this Court issued a prison sentence of 84 months for Bryant and a sentence of 24 months for Kusi, significantly below their Sentencing Guidelines ranges (of 121–151 months and 97–121 months, respectively).  The Guidelines ranges were driven in part by an 18-level enhancement to Petitioners' total offense levels based on a loss amount greater than $3.5 million.  But if, instead, the loss amount was calculated to be below $3.5 million, Petitioners would have had a TOL enhancement of 16, instead of 18.  *See* U.S.S.G. § 2B1.1.  In that case, the Guidelines ranges would have been 97–121 months for Bryant (instead of 121–151) and 78–97 months for Kusi (instead of 97–121).  *See id.*

In imposing the 84 and 24 month sentences, this Court departed from the Guidelines ranges and issued terms of imprisonment "well below their respective Guideline ranges"—below even the recommended ranges for the hypothetical, lower TOLs that would have applied with a reduced loss amount.  (Gov. Resp. in Opp'n at 33, ECF No. 189).  But that does not mean that there was no prejudice.  The Supreme Court has explained that, "[i]n most cases a defendant who has shown that the district court mistakenly deemed applicable an incorrect, higher Guidelines range has demonstrated a reasonable probability of a different outcome."  *Molina-Martinez v. United States*, 578 U.S. 189, 200 (2016).  It is the exceptional case where "the district court thought the sentence it chose was appropriate irrespective of the Guidelines range."  *Id.*  The burden rests on the Government to "poin[t] to parts of the record—including relevant statements by the judge—to counter any ostensible showing of prejudice the defendant may make."  *Id.* at 200–01 (alteration in original) (internal quotation marks and citation omitted).

---

reduced by $1.4 million.  But that possibility does not alter the reality that trial counsel could have and should have raised these issues, which could have reduced the loss amount by nearly 40%.

Here, the Government has not pointed to any portions of the sentencing record indicating that this Court would have imposed the same sentence; the Court's invocation of Petitioners' "avarice and greed," sexual misconduct by Bryant, and Bryant's role as mastermind of the scheme do not establish how the Guidelines affected its reasoning—and thus whether a different Guidelines range may have resulted in different outcomes for Petitioners.  (*See* Gov. Resp. in Opp'n at 20, ECF No. 189).  And "[w]here . . . the record is silent as to what the district court might have done had it considered the correct Guidelines range, the court's reliance on an incorrect range in most instances will suffice to show an effect on the defendant's substantial rights."  *Molina-Martinez*, 578 U.S. at 201; *see also United States v. Feldman*, 793 F. App'x 170, 173–176 (4th Cir. 2019).

Accordingly, this Court finds that trial counsel provided ineffective assistance at sentencing; their failure to dispute the loss amount attributable to compound cream prescriptions written by Dr. Rivera after October 27, 2014, and to the full extent of the amount billed rather than the amount reimbursed, was deficient and prejudicial.  Had they identified those issues at sentencing, there is a "reasonable probability" that the total loss amount would have been revised downward.  Petitioners' third ground for relief is **GRANTED**.

## V.    CONCLUSION

For the reasons stated more fully above, the Court **GRANTS IN PART and DENIES IN PART** the § 2255 petitions.  Because trial counsel's failure to request a mistrial or provide evidence about CPT code 90837 was not deficient and the failure to adduce evidence regarding the proper scope of CPT code 90838 was not prejudicial, Petitioners' first and second grounds for relief are **DENIED**.  An evidentiary hearing is not required, *see* 28 U.S.C. § 2255(b), as the record "conclusively show[s] that the prisoner[s] [are] entitled to no relief" on grounds one and

two. *Id.* Moreover, as to these grounds, because reasonable jurists would not disagree, *see Slack v. McDaniel*, 529 U.S. 473, 484 (2000), Petitioners are denied certificates of appealability and this Court certifies to the Sixth Circuit that any appeal would be objectively frivolous and should not be permitted to proceed *in forma pauperis*.

But because trial counsel failed to raise several crucial issues with the Government's loss amount calculation at sentencing, which would have affected the applicable Sentencing Guidelines ranges, the Court **GRANTS** Petitioners' third ground for relief and sets aside their sentences. Accordingly, Petitioners shall be resentenced. Pursuant to Local Rule 32.1, the U.S. Probation Department is directed to issue an amended initial presentence investigation report ("PSR") within 44 days of this Order, at which point the parties shall have 21 days to file any objections to the amended initial PSR.

**IT IS SO ORDERED.**

_____
**ALGENON L. MARBLEY**
**CHIEF UNITED STATES DISTRICT JUDGE**

**DATE: June 30, 2023**